UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ZA'KARI DIJON,

        Plaintiff,    :

  v.                              Case No. 2:20-cv-05873
                                  Judge Sarah D. Morrison
                                  Magistrate Judge Kimberly A.
CENTRAL OHIO TRANSIT        Jolson
AUTHORITY,               :

        Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Central Ohio Transit Authority's ("COTA") Motion for Summary Judgment. (Mot., ECF No. 27.) COTA argues there are no genuine issues of material fact in Plaintiff Za'Kari Dijon's case for sex discrimination. (*Id.*) Ms. Dijon opposed (Opp., ECF No. 32), COTA replied (Reply, ECF No. 35), and the Motion is ripe for consideration.

For the reasons set forth below, COTA's Motion is **GRANTED.**

### I.    FACTUAL BACKGROUND

The parties agree on many of the facts in this case, but they dispute why COTA terminated Ms. Dijon's employment as a student bus operator a mere eight days after she began training. Ms. Dijon argues she was terminated in retaliation for reporting discriminatory comments made by a supervisor, while COTA contends she was terminated because she was late on two occasions in violation of company policy. The facts supported by the record are summarized below.

### A. COTA hires and onboards Ms. Dijon.

On September 16, 2019, Ms. Dijon, a transgender woman,[1] began work at COTA. (Dijon Dep. 51:7–20, 54:7–11, ECF No. 21-1.) Because Ms. Dijon had a commercial driver's license ("CDL") when she began at COTA, she was placed in the "Fast Track" student bus operator training program, which lasts nine weeks. (*Id.* 69:15–24; Wilks Dep. 21:16–18, ECF No. 24-1.) Todd Kegler was Ms. Dijon's classroom trainer; his responsibilities included checking in students each day and distributing COTA policies. (Kegler Dep. 15:4–6, 56:24–57:1, ECF No. 22-1.) Leslie Wilks was Ms. Dijon's road trainer; she oversaw the training that involved physically driving the bus. (Wilks Dep. 30:6–22.)

Mr. Kegler distributed the Student Operator Attendance Policy to his students. (Kegler Dep. 83:21–84:10.) Ms. Dijon signed the Policy on her second day of employment. (ECF No. 27-4.) The Policy states: "Students are required to report to work on-time for both classroom instructions and driving. This includes: start-of-day. . . . Tardiness of even one minute is not acceptable and *can* disqualify you from employment with COTA." (*Id.* (emphasis in original).) The Policy continues on, explaining "[i]f you are sick and unable to report to work, you must call the Division Supervisor at least one hour before your scheduled report time. If you do not call one hour prior to the scheduled report time, you can be disqualified from

---

[1] COTA knew Ms. Dijon was transgender because COTA employees simultaneously reviewed Ms. Dijon's Ohio driver's license (which listed Ms. Dijon's sex as male) and Department of Transportation card (which listed Ms. Dijon's sex as female). (Dijon Dep. 73:20–74:24.)

2

employment with COTA." (*Id.*) Finally, the Policy warns "[a]bsence of two (2) days will disqualify you from the current training class." (*Id.*)

Harvey Richardson, Superintendent/Manager of Transportation Training, testified that two unexcused attendance issues by a student bus operator warrants termination; but attendance issues may be excused if a student provides documentation (like a doctor's note) upon returning to work. (Richardson Dep. 24:4–13, 26:3–19, 29:9–13, ECF No. 23-1.)

**B.      Ms. Wilks makes discriminatory comments, and Ms. Dijon talks to Mr. Kegler.**

On Ms. Dijon's third day of training, she was on a bus with Ms. Wilks and classmates when she overheard Ms. Wilks making discriminatory comments. Ms. Wilks said: "there's some people who give . . . [their] ovaries . . . [their] woman parts to trans women so they can have kids. . . . that's just disgusting, and that's not what God intended." (Dijon Dep. 93:5–13.) Ms. Wilks "went on and on about it." (*Id.* 93:13.)

Later that day after classroom training, Ms. Dijon talked to Mr. Kegler about Ms. Wilks' comments on the bus. (*Id.* 96:14–24.) Specifically, Ms. Dijon asked Mr. Kegler "who she could report someone pushing their agenda on them." (Kegler Dep. 62:6–8.) Ms. Dijon did not share specifics about Ms. Wilks' comments, nor did she specify that Ms. Wilks was the person who made the comments, although she made clear she was referring to a supervisor. (*Id.* 62:9–19; Dijon Dep. 97:20–24 ("I basically asked him how—how would he handle a situation—I kind of gave him the scenario without—not trying—not putting no one name in something.").) Mr. Kegler

3

replied that she could file a complaint with him, which he would take to his boss (Mr. Richardson) or she could go to Mr. Richardson directly. (Kegler Dep. 63:3–11.) Ms. Dijon said, "nothing will happen anyway," to which Mr. Kegler responded, "that's not true . . . if it's something bad, then, you know, they will follow the steps to take care of it." (*Id.* 64:1–12.) According to Mr. Kegler, Ms. Dijon "laughed it off" and walked away. (*Id.* 64:11–12.)

### C. Ms. Dijon is late for training on two occasions and is terminated.

During her second week of training, Ms. Dijon was late on two occasions. On September 23, 2019, Ms. Dijon was to arrive at work at 5 a.m., but did not arrive until 5:20 a.m. (ECF No. 27-6.) She told Mr. Kegler she thought class started at 5:30 a.m. (*Id.*) Mr. Kegler completed a Performance Counseling and Discipline form documenting the tardiness. (*Id.*)

The next day, Ms. Dijon was late again. (ECF No. 27-7.) She was supposed to arrive to work at 5 a.m. but arrived at 5:35 a.m. without calling to report she would be late or providing Mr. Kegler with a doctor's note. (*Id.*; Dijon Dep. 128:3–4; 174:7–9.) She explained to Mr. Kegler that she had a stomach bug.[2] (Dijon Dep. 174:7–9.) Mr. Kegler again documented the tardiness, but this time checked the "Final" discipline box and noted that Ms. Dijon had been disciplined for tardiness before. (ECF No. 27-7.) Mr. Kegler made Mr. Richardson aware of Ms. Dijon's tardiness,

---

[2] While Mr. Kegler advised the student bus drivers on the first day of class that they could bring a doctor's note if they were tardy or absent, he did not ask Ms. Dijon if she had one when she told him she was late as a result of a stomach bug. (Dijon Dep. 174:9; Kegler Dep. 101:7–17.)

4

(Kegler Dep. 76:19–23), and Ms. Dijon was terminated the same day (Richardson Dep. 44:9–11; 46:5–7).

## II. PROCEDURAL BACKGROUND

Ms. Dijon filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Right to Sue Letter in November 2020. (ECF No. 1-3.) She filed suit in this Court shortly thereafter. (Compl.) Following discovery, COTA filed this Motion for Summary Judgment, which is now ripe for review.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as

5

to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. ANALYSIS

In Count I, Ms. Dijon claims COTA violated federal law by discriminating against her on the basis of sex. (Compl. ¶¶ 58–65.) In Count II, Ms. Dijon claims COTA retaliated against her in violation of federal law when it terminated her employment after she made a report of discrimination. (*Id.* ¶¶ 66–71.)

### A. Sex Discrimination Claim (Count I)

Under federal law, it is illegal "for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In *Bostock v. Clayton County, Georgia*, the Supreme Court held that: "An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." 140 S.Ct. 1731, 1737 (2020). The words "because of such individual's . . . sex," include because an individual is homosexual or transgender.

6

A plaintiff can prove discrimination using either direct or circumstantial evidence. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Ms. Dijon does not argue that she has direct evidence of discrimination, and in the absence of direct evidence, discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under this approach, a plaintiff must first establish by the preponderance of the evidence a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–53. Doing so creates a rebuttable presumption that the employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 252–53. This burden is not onerous; an employer satisfies its burden if it articulates a valid rationale for its decision. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

If a defendant presents a legitimate, non-discriminatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a genuine issue of material fact as to whether the proffered reason is in fact a pretext for" unlawful discrimination. *Walcott v. City of Cleveland*, 123 F. App'x 171, 176 (6th Cir. 2005). The ultimate burden of persuasion remains on the plaintiff throughout this analysis. *See Burdine*, 450 U.S. at 253.

### 1. *Ms. Dijon's* Prima Facie *Case*

To establish her *prima facie* case of discrimination, Ms. Dijon must show (1) she was a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) she was replaced by a person outside the protected class or was treated differently than similarly situated non-protected employees. *White*, 533 F.3d at 391 (citing *McDonnell Douglas*, 411 U.S. at 802). The parties dispute element four only. (Mot. PageID 1669–77; Opp. PageID 1786–88.)

Ms. Dijon makes two arguments to support the fourth element of her *prima facie* case: (1) she was replaced with a cisgender male, Terraine Leflore; and (2) a cisgender male who was similarly situated arrived late three times but was not terminated. (Opp. PageID 1786–88.)

Ms. Dijon supports her first argument with Ms. Wilks' deposition testimony. (Wilks Dep. 94:21–25.) Ms. Wilks testified that Mr. Leflore "was a student that I acquired a few weeks after [Ms. Dijon's termination] 'cause he was with another trainer, and they switched students." (*Id.*) When asked if Mr. Leflore "replaced" Ms. Dijon, Ms. Wilks answered that she "wouldn't say they [COTA] replaced her, but he [Mr. Leflore] was a Fast Tracker" like Ms. Dijon, and he came to Ms. Wilks' class "a couple weeks after" Ms. Dijon left. (*Id.* 94:25–95:13.) Mr. Leflore was "already in class. He was just with another trainer." (*Id.* 141:1–6.)

COTA argues Ms. Wilks' testimony on its own demonstrates that Ms. Dijon was not replaced by Mr. Leflore. COTA explains it doesn't replace students in its training programs once those programs start; rather, it simply hires more student

8

bus operators to fill the next training programs. (Reply PageID 1947–48) (Kegler Dep. 132:3–7) ("We don't—when a student either resigns or gets terminated, we just—no one comes in and replaces them in that class."); (Richardson Dep. 86:3–10) ("I'm sure people were hired after her, but, you know, it's not a position to replace. It's just, . . . continued hiring. I could say no one replaced her, but there was a class after that.").

The testimony makes clear Ms. Dijon was not replaced. A person is not replaced "when the work is redistributed among other existing employees." *Golden v. Mirabile Inv. Corp.*, 724 F. App'x 441, 447 (6th Cir. 2018) (citing *Myers v. U.S. Cellular Corp.*, 257 F. Appx. 947, 952 (6th Cir. 2007).) Here, Ms. Dijon did not have duties or responsibilities that needed to be redistributed because she was a student bus operator in training. Rather, COTA continually hires and trains new hires with classes running one after another. Thus, Mr. Leflore (or any other individual hired as a student bus operator) did not "replace" Ms. Dijon.

Next, Ms. Dijon argues an unnamed, similarly situated, cisgender male had three late arrivals, but was not terminated. (Opp. PageID 1788.) For the cisgender employee to be an appropriate comparator, Ms. Dijon must demonstrate that she and he were similarly situated in all relevant respects. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Mitchell v. Toledo*, 964 F.2d 577, 583 (6th Cir. 1992). In the disciplinary context, "similarly situated" means that "the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and

9

have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Gosbin v. Jefferson Cnty. Comm'rs*, 725 F. App'x 377, 384 (6th Cir. 2018). Yet, Ms. Dijon "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated.'" *Ercegovich*, 154 F.3d at 352 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In determining relevance, courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.*

Ms. Dijon's proposed comparator was also a student bus operator in Mr. Kegler's class. (Kegler Dep. 119:24–123:23; ECF No. 22-2, PageID 792.) His first late arrival was excused by COTA because it related to his expired CDL, which "should have been handled before he came to [COTA]." (Kegler Dep. 122:23–123:3.) The other two late arrivals were related to his daughter being sick or having an allergic reaction. (*Id.* 121:6–122:9.) While he did not bring it with him, he told Mr. Kegler that he had a doctor's note. (*Id.* 124:14–17.) After the cisgender employee was late two days in a row, his supervisors told him "to go home and think about whether or not he wanted his job over the weekend and that he needed to bring in documentation, a doctor's note, for his daughter on Monday." (*Id.*) On Monday, he brought the doctor's note and was not terminated. (*Id.*) Based on these facts, Ms. Dijon argues she was treated differently than this cisgender employee. (Opp.

10

PageID 1788.) She points out that Mr. Kegler did not advise her that she could bring a doctor's note on the day that she was tardy because of the stomach flu. (*Id.*)

COTA counters that mitigating circumstances existed as to the cisgender employee's tardiness—one instance was excused because it should have been dealt with prior to the start of training, and the other two were excused because he had a doctor's note documenting his daughter's illness. (Reply PageID 1949.) COTA emphasizes that Ms. Dijon did not inform Mr. Kegler that she went to the doctor or could produce a doctor's note. (*Id.*)

While reasonable jurors might take notice of facts distinguishing Ms. Dijon's situation and the cisgender employee's situation—like the excused absence because of the CDL issues and existence of a doctor's note—the Court finds Ms. Dijon has met her burden to show she was treated differently than a similarly situated employee outside the protected class. She and the cisgender employee were both student bus operators in Mr. Kegler's class. They were both late on two or more occasions, and some of their tardiness was due to sickness (Ms. Dijon's own; the cisgender employee's daughter's). Neither called their supervisor "at least one hour before [her or his] scheduled report time" to report sickness and inability to work as dictated by the Policy. (*See* ECF No. 27-4.) Yet, the cisgender employee was given the opportunity to go home for the weekend and bring in a doctor's note, while Ms. Dijon was terminated on the same day she was tardy for a second time. (Kegler Dep. 119:24–124:5.) Mr. Kegler admitted that he did not advise Ms. Dijon she could get a doctor's note when she said she had a stomach bug but the cisgender employee

11

received such an opportunity. (*Id.* 123:24–124:1.) Thus, Ms. Dijon has identified a similarly situated comparator and has established her *prima facie* case of discrimination.

> 2. *COTA's Legitimate, Non-Discriminatory Reason for Termination and Ms. Dijon's Pretext Arguments*

COTA offers that it terminated Ms. Dijon because she arrived to work late on two occasions, unexcused. (Opp. PageID 1674.) COTA explains why timeliness is crucial:

> COTA's transportation system runs on a strict schedule. Therefore, COTA must employ people who adhere to such schedule. Bus operators who are even a few minutes late, consequently delay the whole system. COTA's customers rely on the schedule to get them places like their jobs, school, or the hospital. Being timely and reliable are at the core of COTA's business standard—and they hold bus operators to this high standard.

(Reply, PageID 1947.) Mr. Richardson reiterated this during his deposition: "Whether you're late or if she missed, they're both considered misses. Just in [COTA's] line of work . . . that's what we were trying to prepare students for. You know, because if you don't show up on time, the bus doesn't get out, people don't get to work." (Richardson Dep. 55:13–19; *see also* ECF Nos. 27-4, 27-6, 27-7.)

COTA has offered a valid rationale for its termination decision sufficient to "raise a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55; *see Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 577–78 (6th Cir. 2004) (finding Honda had a legitimate business reason for demanding near-perfect attendance from its employees). The burden shifts back to

12

Ms. Dijon "to demonstrate that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 255.

To show pretext, Ms. Dijon may establish that COTA's proffered reason: (1) had no basis in fact; (2) did not actually motivate its action; or (3) was insufficient to motivate its action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.*

Ms. Dijon offers two arguments in support of pretext. First, she argues "there is a question of fact whether Defendant consistently enforced its policies against a transgender employee versus a nontransgender employee" because "other individuals have had greater than two attendance violations and remained employed." (Opp, PageID 1789.) Yet, Ms. Dijon does not point to "other individuals," she highlights only one individual—the cisgender employee comparator discussed *supra*. To support a theory that COTA inconsistently applied its Policy in a discriminatory fashion, Ms. Dijon needs additional evidence, but submits none.

There is also evidence on the record contradicting Ms. Dijon's position and supporting the conclusion that COTA does indeed consistently enforce its Policy. For example, Ms. Wilks testified that "as far as [she] could remember" Ms. Dijon was her only trainee that was terminated for tardiness, but "[t]here's been other trainers that have had people that were late and were terminated." (Wilks Dep.

13

38:9–21.) Ms. Wilks explained that if a student bus operator is late the trainers "have to let Harvey [Richardson] know immediately." (*Id.* 39:20–40:6.) Tardiness was excused on occasion where, for example, the trainee had car trouble, sickness, or a family emergency, but the trainee would "just have to communicate with us and let us know" by a call or email. (*Id.* 40:7–23.) Ms. Dijon failed to communicate with her supervisors in such a manner on the days she was tardy.

Ms. Dijon next argues COTA's termination reason was pretextual because she "made a complaint about a supervisor and was terminated within three days." (Opp. PageID 1789.) Ms. Dijon conflates her Title VII sex discrimination pretext argument with her claim that she was retaliated against by COTA after reporting Ms. Wilks' discriminatory comments. The Court analyzes this pretext argument as part of her retaliation claim.

Accordingly, there is no genuine issue of material fact as to Ms. Dijon's discrimination claim. Summary judgment is **GRANTED** to COTA on Count I.

### B. Retaliation Claim (Count II)

Like a Title VII discrimination claim, a Title VII retaliation claim can be established through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). In the absence of direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework also applies to Ms. Dijon's retaliation claim. *See Gipson v. Dep't of Rehab. & Corr.*, No. 2:18-CV-315, 2020 WL 1233638, at *10 (S.D. Ohio Mar. 13, 2020).

To establish her *prima facie* case of retaliation, Ms. Dijon must demonstrate that: (1) she engaged in activity protected by Title VII; (2) her exercise of such protected activity was known by COTA; (3) thereafter, COTA took an action that was materially adverse to Ms. Dijon; and (4) a causal connection existed between the protected activity and the materially adverse action. *See Jones v. Johanns,* 264 F. App'x 463, 466 (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003)).

Ms. Dijon argues that there is no dispute that she made a complaint to COTA, which is a protected activity, and her employment was terminated only three days after she made her complaint. (Opp. PageID 1790–91.) She urges that the temporal proximity between these two events—her complaint and termination—supports an indirect inference of retaliation, and so she has made her *prima facie* case for retaliation. (*Id.*)

COTA responds that Ms. Dijon's retaliation claim fails as to *prima facie* elements one and four. COTA asserts Ms. Dijon did not engage in a protected activity because when she spoke to Mr. Kegler about a supervisor "pushing their agenda on them," she did not indicate who the supervisor was, what occurred, or what "pushing their agenda" referred to. (Mot., PageID 1679.)

As to element four, COTA contends Ms. Dijon cannot prove her termination would not have occurred but for her conversation with Mr. Kegler. That she was terminated a few days after her conversation with Mr. Kegler is not enough to

15

establish causation, particularly when she arrived late twice, two days in a row, after her conversation with Mr. Kegler and before termination. (Mot. PageID 1680.)

Starting the analysis with the first element, Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice. *Driggers v. City of Owensboro, Kentucky*, 110 F. App'x 499, 510 n.4 (6th Cir. 2004) (oral complaint to a supervisor sufficed); *Delisle v. Brimfield Twp. Police Dep't*, 94 F. App'x 247, 257 (6th Cir. 2004) (informal complaints to supervisors sufficed). A complaint need not be made with absolute formality, clarity, or precision, but an employee is not protected if the opposition is merely a "vague charge of discrimination." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). Here, Ms. Dijon did not provide Mr. Kegler with enough information for their conversation to constitute a report or complaint of discrimination—she did not share who made the comments to her or what the comments were about. All she shared with Mr. Kegler was that a supervisor was "pushing their agenda on them." (Kegler Dep. 62:6–19.) Ms. Dijon admitted that she did not name Ms. Wilks during her discussion with Mr. Kegler. (Dijon Dep. 97:20–24.) And, while Ms. Wilks' comments were indeed inappropriate and discriminatory, Ms. Dijon did not even allude to the content of the comments when she talked to Mr. Kegler. (Kegler Dep. 62:6–63:19.) As COTA argues, an "agenda" could implicate one's political, religious, or social beliefs. (*See* Mot. PageID 1679.) Without more, Ms. Dijon has failed to show she engaged in an activity protected by Title VII.

Ms. Dijon has also failed to show a causal connection between her conversation with Mr. Kegler and her termination. She has not provided evidence of a link between the conversation and her termination, and the "relatively short amount of time elapsed does not, by itself, imply causation." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013); *see Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). Moreover, "an intervening legitimate reason" to take an adverse employment action "dispels an inference of retaliation based on temporal proximity." *Kuhn*, 709 F.3d at 628 (finding plaintiff's extended discretionary leave and failure to return to work was an intervening reason for termination); *see Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (holding that an oil rig worker who had complained about sexual harassment to his superiors, but who subsequently left his worksite without authorization, had engaged in an intervening event that gave his employer a legitimate reason to discipline him). Like the plaintiffs in *Kuhn* and *Wasek*, Ms. Dijon's late arrivals to work on two separate and consecutive occasions during training constituted an intervening legitimate reason for her termination, particularly where she signed a Policy acknowledging the seriousness of and ramifications for tardiness in a profession where timeliness is of the utmost importance.

Ms. Dijon has not established a *prima facie* case of retaliation. Summary judgment is **GRANTED** to COTA on Count II.

17

## V. CONCLUSION

For the reasons set forth above, COTA's Motion for Summary Judgment (ECF No. 27) is **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**